# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*Uesco Industries, Inc. v. Poolman of Wisconsin, Inc.*, 2013 IL App (1st) 112566

---

| | |
|---|---|
| Appellate Court Caption | UESCO INDUSTRIES, INC., an Illinois Corporation, Individually and as the Representative of a Class of Similarly Situated Persons, Plaintiff-Appellee, v. POOLMAN OF WISCONSIN, INC., Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-11-2566 |
| Filed | June 17, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a class action alleging that defendant violated the Telephone Consumer Protection Act by sending unsolicited fax advertisements, the trial court erred in granting plaintiff's motion for class certification, since plaintiff failed to state a valid claim against defendant and was not an appropriate class representative for those who received unsolicited faxes from defendant. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CH-16028; the Hon. Carolyn Quinn, Judge, presiding. |
| Judgment | Reversed and remanded. |

| | |
|---|---|
| Counsel on Appeal | SmithAmundsen LLC, of Chicago (Eric L. Samore, Michael Resis, and Molly A. Arranz, of counsel), for appellant. |
| | Bock & Hatch, LLC, of Chicago (Phillip A. Bock, Robert M. Hatch, Jonathan B. Piper, Tod A. Lewis, and James M. Smith, of counsel), and Anderson & Wanca, of Rolling Meadows (Brian J. Wanca and David M. Oppenheim, of counsel), for appellee. |
| Panel | JUSTICE DELORT delivered the judgment of the court, with opinion. Presiding Justice Hoffman and Justice Cunningham concurred in the judgment and opinion. |

## OPINION

¶ 1    The ability to electronically send enormous volumes of advertisements at minimal cost, and the nuisances those advertisements create in daily life, have resulted in a number of laws aimed at limiting those practices. After determining that reams of unsolicited advertisements were clogging facsimile transmission machines, Congress imposed a stiff $500-per-fax penalty in an attempt to price facsimile advertisers out of the marketplace. Some businesses, unaware of the federal law and believing that faxed advertisements might actually generate new customers, continued to hire specialized businesses to send faxes on their behalf. The senders, in turn, perhaps fully aware of the legal prohibitions against their transmissions, relied on loopholes in the law to avoid liability for the penalties, or operated from foreign locations from which it would be difficult to trace the origin of the advertisements. The $500-per-fax penalty, multiplied by the colossal number of faxes, established a favorable atmosphere for lucrative class action litigation. In this lawsuit, brought by a "junk fax" recipient, we are called upon to determine whether the circuit court properly granted class certification.

¶ 2    Defendant, Poolman of Wisconsin, Inc., appeals an order of the circuit court of Cook County granting plaintiff, Uesco Industries, Inc., class certification in an action alleging violations of the federal Telephone Consumer Protection Act of 1991 (Act) (47 U.S.C. § 227(b)(1)(C) (2006)), and a state law claim for conversion. On this interlocutory appeal, defendant argues that the circuit court erred by granting class certification. Defendant asserts the court did not apply the appropriate legal standard in determining whether plaintiff's claim was actionable and, as a result, plaintiff was not an adequate class representative. Defendant also contends plaintiff's counsel could not adequately represent the class.

¶ 3    We reverse the circuit court's decision to grant class certification. As a result, we conclude the issue of whether plaintiff's counsel is adequate to represent the class is moot.

¶ 4                                          BACKGROUND

¶ 5        Plaintiff is an Illinois corporation in the business of manufacturing and distributing overhead cranes. Defendant, a Wisconsin corporation, services, sells, and repairs swimming pools, hot tubs, and fireplaces.

¶ 6        On April 21, 2009, plaintiff filed a class action complaint alleging that, on or about March 6, 2006, defendant sent an advertisement by facsimile (fax) to plaintiff and over 39 others without the recipients' permission or invitation. Count I of the complaint asserted that defendant thereby violated the Act, which prohibits the use of "any telephone facsimile machine, computer or other device to send, to a telephone facsimile machine, an unsolicited advertisement." 47 U.S.C. § 227(b)(1)(C) (2006). Count II was a state law claim sounding in conversion. It alleged that, by sending plaintiff and others an unsolicited fax advertisement, defendant improperly and unlawfully converted the putative class members' fax machines, toner, paper, and employee time to defendant's own use. Plaintiff attached a copy of the fax it received, which advertised swimming pool and hot tub pumps and parts. Both counts alleged there were common issues of fact and law warranting class certification pursuant to section 2-801 of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/2-801 (West 2008)). On the same date, plaintiff moved for class certification.

¶ 7        On October 8, 2009, defendant filed an answer and affirmative defenses to the class action complaint. Defendant denied that a class action is proper in this matter. In its sixth affirmative defense, defendant asserted that it did not authorize any fax transmittal to plaintiff.

¶ 8        Plaintiff filed an amended class action complaint, elaborating on the allegations of the original pleading, as well as an amended motion for class certification. The amended complaint pled that the initial fax from defendant was received on March 16, 2006, not March 6, 2006. Plaintiff again attached a copy of the fax advertisement it allegedly received to its amended complaint.

¶ 9        On January 18, 2011, defendant moved for summary judgment on plaintiff's amended class action complaint. Defendant argued that the undisputed facts established defendant did not send or authorize the sending of the fax advertisement to plaintiff in March 2006. Rather, without a formal contract, defendant hired a third-party fax broadcaster, Business to Business Solutions (B2B), to send fax advertisements only to small electric motor repair and service companies. Based on deposition testimony from Wesley Wiedenbeck (one of defendant's two shareholders, officers, and directors) and Caroline Abraham (the sole proprietor of B2B), defendant asserted that, aside from directing B2B to advertise solely to small electric motor repair and service companies and approving the advertising design, defendant was not involved with the advertising campaign. Defendant asserted that it did not create or see the list of fax recipients and never received confirmation that the faxes were sent. Defendant argued that it could not be held liable under the Act or for conversion not only because defendant did not authorize or instruct B2B to send the fax advertisement to plaintiff, but also because the facts established that B2B exceeded its authority in doing so by sending the advertisement to businesses other than those that repair and service small electric motors.

¶ 10       Plaintiff responded that under the Federal Communication Commission's (FCC) long-

standing interpretation of the Act, liability under the Act generally attaches to the person or entity on whose behalf the fax was transmitted. Plaintiff also argued that the Act does not require proof of authority or agency for liability to attach. Plaintiff further asserted there was no evidence that any recipient of the faxes at issue had given defendant authorization or permission to send them, even if B2B had limited its broadcast to small electric motor repair and service companies.

¶ 11    Defendant also argued that the FCC has defined a "sender" as "the person on whose behalf the fax advertisement is sent," but that neither Congress nor the FCC ever defined the phrase "on whose behalf." Moreover, defendant maintained that "sender" is defined with respect to a defense to liability, but that the term does not appear in the prohibition against sending unsolicited fax advertisements. Defendant further contended that the common law rules of agency are incorporated into any claim created by the Act and operate to bar plaintiff's complaint, because B2B operated outside defendant's instructions. Lastly, defendant argued that, absent class certification, the sole issue was whether defendant was liable to plaintiff, without examining potential liability to other members of the putative class.

¶ 12    On June 3, 2009, the circuit court heard argument on defendant's summary judgment motion. The court also considered the following pertinent deposition testimony from Wiedenbeck, Abraham, and James Martin, plaintiff's accounting manager.

¶ 13    Wiedenbeck testified that he and his wife have owned defendant since 2000. The idea to advertise by fax originated from a broadcast fax advertisement defendant received from B2B. The fax advertised B2B's services and stated, "Conforms to February, 2006 faxing guidelines!" Wiedenbeck believed that statement meant B2B's fax advertisement services were legal. He considered that advertising by fax could provide a "good marketing stream."

¶ 14    After receiving the broadcast fax, Wiedenbeck contacted B2B and spoke to a "Kevin Wilson" to obtain additional information. Wilson faxed Wiedenbeck a form explaining how to order B2B's fax advertising services. In return, Wiedenbeck faxed Wilson the design and layout that B2B requested. Wiedenbeck testified Wilson told him B2B would send faxes only to those persons or companies who gave permission to receive such advertising. At the time Wiedenbeck decided to hire B2B, he believed it was legal to send unsolicited advertising faxes.

¶ 15    On March 8, 2006, Wilson faxed two letters to Wiedenbeck. One of the letters described B2B's services and stated, "We do everything for you. We even write your fax ad and supply the business numbers to fax." The second letter thanked Wiedenbeck for providing the details of defendant's business for inclusion in the fax advertisement. The second letter, which included in its letterhead a company named, "MaxiLeads," stated:

"We will not send faxes without your approval. When the ads are completed, we will fax them to you for your approval. Select the ad you like best and make any necessary changes.

After your final approval, we'll send your fax ads immediately to where they're most apt to bring you new customers. Your advertising will reach thousands within a few short days."

¶ 16    The letter was signed by Wilson and the letterhead provided an electronic mail (email) address for a Kevin Wilson in Romania. A contact telephone number on the letterhead listed a New York area code.

¶ 17    On the same date, Wiedenbeck faxed a cover sheet with defendant's letterhead to Wilson, stating, "At this point in time I would like only to market to 'Small Electric Motor Repair + Service Companys [*sic*]' nationally so please tell me how much it will be." Wiedenbeck recalled a conversation he had with Wilson during which Wilson specifically told Wiedenbeck that B2B could market to a list of fax telephone numbers for small electric motor repair and service companies. Wiedenbeck did not ask Wilson where he was able to obtain such a list. Wiedenbeck also did not ask Wilson for a copy of the list of fax numbers to be utilized in the advertising campaign.

¶ 18    On March 9, 2006, Wilson faxed a letter to Wiedenbeck requesting additional corrections to the advertisement, if necessary, and to reply with a written approval if Wiedenbeck approved of the advertisement. The letter also stated, "We will call you to make the final arrangements for your advertising campaign." Wiedenbeck apparently received a second copy of the same letter, but dated March 14, 2006. Wiedenbeck faxed to Wilson the copy of the March 14, 2006 letter with the revised advertisement attached. The attached draft of the advertisement included defendant's B2B client number and a handwritten approval signed by Wiedenbeck, stating, "Add [*sic*] Looks Great." The approved advertisement included a paragraph of small print at the bottom of the page stating the following:

> "The above sponsor is not affiliated with, nor endorsed by, any charitable organization [–] Please Contribute to Reputable American Charities Dedicated to Helping Hurricane Victims *** This is a private and confidential charitable message intended only for the above named party. If you, or someone acting in your behalf, did not request or allow us, our agents, our customers, or our sponsors, to send faxes to this number, we sent this message in error, and we apologize. To STOP charitable or other faxes, call the 'Remove' Hotline (below). To continue to receive, do NOT call the Remove Hotline. This message is the exclusive property of Macaw, SRL, 46 Match Factory St, Sec 5, Buc, Rom, 050183, 40723294564, which is solely responsible for its contents and destinations. Date and time stamp are at the top of this page."

¶ 19    Wiedenbeck testified that he read the small print on the draft advertisement and that it "helped give credibility to the company as well, that if you want your information deleted, then we will do that, because I received stuff like this over my fax machine all the time, and I never knew it was illegal."

¶ 20    In response to Wiedenbeck's approval, Wilson faxed another letter dated March 14, 2006, requesting payment for services. The letter stated, "As agreed, you pay only $28 to join our Priority Club, the Priority Club rate of $214 for us sending 6,000 fax ads (in 3 sets of 2,000 each), and $60 to personalize the ads (1 cent each). This comes to a total of $302." The letter instructed Wiedenbeck to make the payment to "Business to Business Solutions." Wiedenbeck requested in a response fax to Wilson that the fax advertisement campaign not proceed before March 16, 2006. Wiedenbeck could not recall whether he received any communication from B2B that the fax advertisements had been sent.

¶ 21    On November 14, 2006, Wiedenbeck received another fax from Wilson with a letterhead from a company named, "The Marketing Research Center," and a contact telephone number with a different New York area code. The letter proposed another fax advertising campaign costing $950 to transmit 31,600 personalized advertisements "to all the fax numbers that we have for hotels and motels in the U.S." The letter requested that payment be made to "Business to Business Solutions" and not The Marketing Research Center. Wiedenbeck responded on December 1, 2006 and requested a different layout for the second advertisement, which he sent to Wilson by email. Wiedenbeck could not recall how many fax advertisements were sent as part of the second campaign. Wiedenbeck received a faxed letter from Wilson on December 13, 2006, stating that B2B received payment for the second campaign. The letter also stated:

> "Note that some fax recipients may contact you and complain. Do NOT let this bother you. This is normal and harmless. If you do receive a complaint, say exactly,
>
> > 'We apologize and thank you for calling. We sent the ad to you by mistake. It will never happen again if you give me your number!'
>
> Take the number, say 'Thank you,' and hang up. If they call back say the same thing and hang up again. At the end of the day, go to www.removemynumbernow.com and register the numbers you have received."

Turning a deliberately blind eye to the fact that the unsolicited faxes were illegal, B2B's letter also included a warning that Wiedenbeck could receive telephone calls or letters from "Whackos" claiming that the fax "is illegal," among other things. The letter recommended that if Wiedenbeck received such calls or letters, he should "immediately report all such contacts to the state bar association and the local police."

¶ 22    Wiedenbeck testified that defendant maintains both a hard copy and a computer database of its customer lists. Wiedenbeck did not know whether any of defendant's customers received a fax advertisement sent by B2B on behalf of defendant. Wiedenbeck did not send defendant's customer lists to B2B. According to Wiedenbeck, defendant never entered into a formal contract with B2B.

¶ 23    Significantly, the record does not demonstrate that plaintiff received the fax advertisement from the second campaign. It does appear from the record that plaintiff received the advertisement from the first campaign in March 2006, as to which Wiedenbeck specifically instructed B2B to send fax advertisements solely to companies that repair and service small electric motors. In addition, the record contains no evidence of express instructions from Wiedenbeck to B2B limiting the second fax advertising campaign to small electric motor repair and service companies.

¶ 24    Abraham testified that B2B operated from August 2005 through September 2007. B2B maintained two business addresses in Brooklyn, New York, and Los Angeles, California, for its telephone lines and computers to control outgoing faxes. B2B had no employees. Instead, B2B worked with a Romanian company named "Macaw, SRL" (Macaw), to set up databases for its customer lists. B2B received payment from its customers and then paid Macaw for the services Macaw provided to B2B. B2B stopped working with Macaw in September 2007 when lawsuits began to be filed against B2B for the faxing of advertisements. Abraham

identified Kevin Wilson as a salesperson for Macaw. The Macaw salespersons were located in the United States, but the advertisement designers operated from Bucharest, Romania. Abraham would receive the designs from Romania and make revisions as necessary. Information technology specialists in Romania sent out the faxes remotely by transmitting instructions to computers located in the United States.

¶ 25    Abraham stated the information technology specialists "created the database of fax numbers for each individual campaign based on the list that they had. They controlled all the faxing computers" in New York and Los Angeles. Abraham testified that certain wholesale industries or businesses wanted to send fax advertisements across the United States to retail customers in their specific industries. Abraham's customers did not provide B2B with the contact information for the intended recipients. The information technology specialists apparently bought customer lists from an unidentified third party, which contained millions of fax telephone numbers. According to Abraham, "customers paid us to fax to as many fax numbers as we had available within the areas or for the industries that they wanted to fax to." B2B had nearly 100 separate land telephone lines it used to send its faxes, in addition to Internet lines from Vonage. Abraham identified "MaxiLeads" and "Marketing Research Center" as simply letterheads intended to generate more business for fax advertising campaigns.

¶ 26    Abraham then testified regarding the fax advertisements B2B sent on behalf of defendant. B2B sent defendant a fax advertisement for its services, including a document entitled, "Tell Us What to Write in Your Free Ads." The advertisement for defendant was designed in Romania and sent to Abraham for editing. The advertisement was last modified on March 8, 2006. Abraham then faxed a cover letter along with the edited advertisement to defendant. Defendant faxed the edited advertisement back to Abraham, which included defendant's client number and the words "ad looks great." Abraham understood this to mean the customer approved the advertisement for broadcast faxing.

¶ 27    Abraham received another fax from defendant on March 14, 2006, with payment instructions and a note written on it stating, "Do not start ad sooner than 3/16/06." The fax from defendant included a copy of a check for payment.

¶ 28    In November 2006, defendant sent Abraham a fax describing a new advertisement for a second campaign. Defendant sent new pictures for the advertisement to Wilson and Wilson forwarded the emails to Abraham. The advertisement designer in Romania created a new advertisement with the pictures forwarded by defendant. The advertisement was last modified on December 5, 2006 and forwarded to defendant. Defendant sent back additional suggested revisions, which were entered on December 12, 2006. After receiving the revised advertisement, defendant sent a three-page fax back to B2B, which included the words, "Great, okay," on the advertisement and a copy of a check for $950.

¶ 29    Abraham agreed that B2B sent out two separate fax advertisement campaigns for defendant. Abraham testified that defendant ultimately approved the form of the advertisement before it was sent out. B2B did not ask permission from the recipients prior to sending the faxes. The advertisements were sent to fax numbers from a large database supplied by the information technology specialists in Romania. Abraham testified it was not

B2B's practice to send its customers a list of fax recipients before sending the fax advertisements. Abraham stated there was no way for defendant to know who would be receiving the fax advertisements.

¶ 30    Abraham never had any conversations with any of defendant's employees. Wilson was B2B's assigned salesperson for defendant. Abraham did not know the substance of any conversations Wilson had with defendant, other than what was contained in the correspondence between Wilson and defendant. Abraham did not know whether Wilson represented to defendant that sending the fax advertisements was legal. B2B and Macaw, not defendant, created the fax recipient lists. Correspondence between Wilson and defendant was drafted by Abraham and sent to defendant by Abraham.

¶ 31    Abraham acknowledged that, in the first fax advertising campaign, defendant sought to limit the fax recipients to "small electric motor repair and service companies nationally." Since defendant requested to limit the fax recipients to small electric motor repair businesses, Abraham testified the information technology specialists were supposed to input that request into the customer database. The following colloquy ensued regarding the procedure for a targeted fax advertising campaign as it applied to defendant:

"Q. Okay. A situation came up where a customer had paid for 5,000 faxes to small electric motor repair companies and there were only 2,000 targets that existed like that. Is it correct to say that [B2B] would expand the scope of the target until they meet the number that had been requested and paid for?

A. Not without instructions from the customer.

Q. Okay. If that situation occurred and they paid for 5,000 and there were only 2,000, what would be the next step?

A. Well, apparently what happened in this case, the count in the database said we were going to send three times to those 2,000.

Q. Okay. Was that something done at the request of the customer or was that something that was just done?

A. It would have been an agreement. The sales agent of the customer would have explained we only have 2,000 here, here's what we can do. Would you like to do it?"

Abraham testified that the payment letter B2B sent to defendant reflected it would send out 6,000 fax advertisements in three sets of 2,000 each.

¶ 32    Martin testified that plaintiff is not in the business of repairing and servicing small electric motors and that this was true in March 2006 when it received the fax advertisement from defendant.

¶ 33    On June 9, 2011, the circuit court denied defendant's motion for summary judgment, ruling that the fax advertisement was sent to plaintiff by B2B on defendant's behalf. The court found "[t]here is no dispute that Defendant hired B2B to send fax advertisements on its behalf. While Plaintiff did not fall within the group of businesses Defendant was seeking to market to, B2B still sent that fax on behalf of Defendant. B2B was authorized to send fax advertisements on the part of Defendant." On the issue of liability, the court found the FCC's regulation interpreting the Act persuasive. The regulation provided that " 'the entity or

-8-

entities on whose behalf facsimiles are transmitted are ultimately liable for compliance with the [Act's] rule banning unsolicited facsimile advertisements.' " *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 FCC Rcd. 12391, 12407 (1995) (hereinafter *In re Rules & Regulations*). The court concluded:

> "While Wiedenbeck testified that he requested the advertisement be targeted to small engine repair businesses, and while Abraham confirmed this, at least one fax was sent to a business not engaged in small engine repair. Nonetheless, the fax was still sent on Defendant's behalf. Nothing in the [Act] or its regulations exempts Defendant from liability because the company it hired, mistakenly or otherwise, sent a fax to someone outside of Defendant's desired target group."

¶ 34    Plaintiff filed a brief in support of class certification, and defendant responded. Two of the arguments raised in defendant's response are relevant to this appeal. First, defendant argued that plaintiff could not adequately represent the class because plaintiff does not have a valid claim against defendant. This argument parallels the argument presented in defendant's motion for summary judgment.

¶ 35    Second, defendant argued that plaintiff's counsel was inadequate to represent the class because it found and solicited this plaintiff (and other plaintiffs) by combing through information obtained in breach of a promise of confidentiality made to an unrepresented third party in other litigation. Based on exhibits attached to the response, defendant asserted that in 2008, plaintiff's counsel, while involved in other litigation involving B2B, sent Abraham an email seeking the contents of the computer on which B2B's data was stored. The email attached a protective order which "will be entered" and would preclude disclosure of the computer drive and backup discs to any third party. Abraham produced the computer drive and backup discs to counsel in January 2009. Defendant maintained that after obtaining B2B's data, plaintiff's counsel initiated over 40 lawsuits against B2B's customers, including initiating this action through correspondence with plaintiff. Defendant also noted that a report prepared by plaintiff's expert in this case was derived from the data obtained in the other litigation. In a footnote to the response, defendant acknowledged that the trial judge in the other litigation ultimately ruled that the information Abraham produced was not subject to the protective order ultimately entered in that case. Nevertheless, defendant argued that counsel's improper conduct rendered counsel inadequate to represent the class in this case.

¶ 36    On August 10, 2011, the circuit court entered a memorandum and order granting plaintiff's motion for class certification. In particular, the circuit court ruled that both plaintiff and counsel could adequately represent the class. The circuit court did not expressly rule that plaintiff stated a claim against defendant. However, the memorandum and order refers to the court's earlier denial of summary judgment, which rejected defendant's argument that plaintiff could not maintain an action against defendant. In addition, the court ruled on the class definition. The court held, "[t]he class does not encompass advertisements not sent on behalf of Defendant. However, the fact that B2B added pages to Defendant's advertisement [as part of the second advertising campaign] does not absolve Defendant of liability for the sending of its own advertisement."

¶ 37    On September 9, 2011, defendant filed a timely petition for leave to appeal to this court

pursuant to Illinois Supreme Court Rule 306(a)(8) (Ill. S. Ct. R. 306(a)(8) (eff. Feb. 16, 2011)). On November 1, 2011, this court denied the petition. On November 30, 2011, this court denied defendant's petition for rehearing. However, on March 28, 2012, the Illinois Supreme Court entered an order denying defendant's petition for leave to appeal to that court, but directing this court to vacate our denial of the petition for leave to appeal, grant the petition, and address the merits of the appeal. *Uesco Industries, Inc. v. Poolman of Wisconsin, Inc.*, No. 113620 (Ill. Mar. 28, 2012) (supervisory order).

¶ 38                                ANALYSIS

¶ 39      On appeal, defendant challenges whether the circuit court: (1) applied the proper legal standard for imposing vicarious liability under the Act; (2) erred by finding plaintiff to be a proper class representative when it received a fax advertisement from B2B contrary to defendant's express directive to limit faxes to "small electric motor repair and service companies"; and (3) applied the appropriate standard under section 2-801 of the Code in determining the adequacy of plaintiff's counsel to represent the class.

¶ 40                           Standard of Review

¶ 41      Defendant maintains this court should use a *de novo* standard of review because the issues presented on appeal are "purely legal." Defendant acknowledges in its opening brief that decisions regarding class certification are reviewed for an abuse of discretion, but asserts, "if a court's findings rest on an erroneous view of the law, 'they may be set aside on that basis,' " quoting *Ross v. RBS Citizens, N.A.*, 667 F.3d 900, 904 (7th Cir. 2012). However, nowhere does the *Ross* court suggest that a court employ a *de novo* review of a district court's class certification order. Indeed, *Ross* states, "[w]e review class certifications decisions for an abuse of discretion." *Ross*, 667 F.3d at 904. In its reply brief, defendant reiterates that this court's review should be limited to legal issues involving the interpretation of chapter 47 of the Act and section 2-801 of the Code. Defendant is not requesting that this court undertake an independent, *de novo* evaluation of the facts. According to defendant, the circuit court's findings "rest on an erroneous view of the class action analysis and must be set aside for that very reason." Defendant insists that a legal issue must be resolved before proceeding to class certification as to whether plaintiff has a cause of action under the plain language of the Act. Defendant has not cited any Illinois authority in support of its argument that we use a *de novo* standard of review.

¶ 42      In Illinois, "[t]he decision regarding class certification is within the discretion of the trial court and will not be disturbed on appeal unless the trial court abused its discretion or applied impermissible legal criteria." *Cruz v. Unilock Chicago, Inc.*, 383 Ill. App. 3d 752, 761 (2008) (citing *Smith v. Illinois Central R.R. Co.*, 223 Ill. 2d 441, 447 (2006)); see also *Avery v. State Farm Mutual Auto Insurance Co.*, 216 Ill. 2d 100, 125-26 (2005). Moreover, " 'where the exercise of discretion has been frustrated by the application of an erroneous rule of law, review is required to permit the exercise in a manner "consistent with the law." ' " *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 274 (1992) (quoting *People v. Brockman*, 143 Ill. 2d 351, 363-64 (1991)).

¶ 43    In other words, Illinois follows the same abuse of discretion standard used in *Ross*. Based on our review of the cases cited by defendant and pertinent Illinois authority, our determination here involves whether the circuit court abused its discretion or applied impermissible legal criteria. *Avery*, 216 Ill. 2d at 125-26; *Cruz*, 383 Ill. App. 3d at 761. See also *Ross*, 667 F.3d at 904.

¶ 44                                    Class Action Requirements

¶ 45    Section 2-801 of the Code, which is patterned after Rule 23 of the Federal Rules of Civil Procedure, sets forth the prerequisites needed to maintain a class action. 735 ILCS 5/2-801 (West 2008). "Given the relationship between these two provisions, federal decisions interpreting Rule 23 are persuasive authority with regard to questions of class certification in Illinois." *Avery*, 216 Ill. 2d at 125. Under section 2-801, a class may be certified only if the following four requirements are established:

> "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of fact or law common to the class, which common questions predominate over any questions affecting only individual members; (3) the representative parties will fairly and adequately protect the interests of the class; and (4) the class action is an appropriate method for the fair and efficient adjudication of the controversy." *Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45, 71-72 (2007).

¶ 46    In its Rule 306(a)(8) petition for leave to appeal, defendant specifically challenged the circuit court's ruling that plaintiff is an adequate class representative. " 'The purpose of the adequate representation requirement is to ensure that all class members will receive proper, efficient, and appropriate protection of their interests in the presentation of the claim.' " *Cruz*, 383 Ill. App. 3d at 778 (quoting *P.J.'s Concrete Pumping Service, Inc. v. Nextel West Corp.*, 345 Ill. App. 3d 992, 1004 (2004)). "The test of adequate representation is whether the interests of the named parties are the same as the interests of those who are not named." *Id*. (citing *P.J.'s Concrete*, 345 Ill. App. 3d at 1004). "To adequately represent the class, plaintiff must be a member of the class." *Eshaghi v. Hanley Dawson Cadillac Co.*, 214 Ill. App. 3d 995, 999 (1991); see also *Ramirez v. Smart Corp.*, 371 Ill. App. 3d 797, 810 (2007) ("To adequately represent the class, the proposed class action plaintiff must be a member of the class.").

¶ 47    "The proponent of the class action bears the burden to establish all four of the prerequisites set forth in section 2-801." *Cruz*, 383 Ill. App. 3d at 761 (citing *Avery*, 216 Ill. 2d at 125). However, there is no need to determine whether these prerequisites are met if, as a threshold matter, the record establishes that the plaintiff has not stated an actionable claim. *Barbara's Sales, Inc.*, 227 Ill. 2d at 72. Put another way, "[a] representative cannot adequately represent a class when the representative does not state a valid cause of action." *De Bouse v. Bayer AG*, 235 Ill. 2d 544, 560 (2009) (citing *Wheatley v. Board of Education of Township High School District 205*, 99 Ill. 2d 481, 486 (1984)). "Named plaintiffs must also establish that they are not seeking relief which is potentially antagonistic to the nonrepresented members of the class." *Ramirez*, 371 Ill. App. 3d at 810.

¶ 48    Although class certification should be determined as soon as practicable after the

commencement of an action (735 ILCS 5/2-802(a) (West 2006)), a motion for summary judgment by the defendant may be heard first. *Dixon v. Mercury Finance Co. of Wisconsin*, 296 Ill. App. 3d 353, 361 (1998). The circuit court may rule on a defendant's summary judgment motion because if the reviewing court were to reverse the summary judgment order, the plaintiff could still move to certify a class. *Dixon*, 296 Ill. App. 3d at 361; see also *Schlessinger v. Olsen*, 86 Ill. 2d 314, 317-18 (1981) (where question of certification of the class is the initial question raised, the question of whether a valid cause of action has been stated is necessarily subsumed in the certification question and, therefore, on appeal, both questions may be reviewed together).

¶ 49                              Vicarious Liability Under the Act

¶ 50        Defendant argues the undisputed facts establish that its owner was solicited by B2B and was assured by B2B that it would only send faxes to people that gave permission to receive advertising faxes. Defendant asserts it only approved that the advertisements be faxed to "small electric motor repair and service companies," and not companies such as plaintiff's, which manufactures and distributes large overhead cranes. Defendant points to deposition testimony from Abraham, in which she agreed that defendant sought to target small electric motor repair and service companies. According to defendant, the starting point of analysis as to its liability should be the language in the Act. Defendant contends the Act nowhere states that the wrongdoer is the entity whose goods or services are featured in the advertisement. Defendant argues a wrongdoer violates the Act if either the following is true: "if it was the actual sender of the fax (direct liability) or if it authorized its agent or officer to send a fax on its behalf (vicarious liability)." Defendant insists there is nothing in the plain language or legislative history of the statute suggesting that Congress intended to impose liability on a party that did not send a fax and also did not authorize a third party to send a fax on its behalf. Defendant asserts the Act does not impose liability on the person or entity whose goods or services are featured in the advertisement unless it was sent by an agent or other person acting within the scope of employment for the common carrier or user. According to defendant, B2B acted contrary to its express instructions and, therefore, the faxes could not have been sent "on defendant's behalf."

¶ 51        Plaintiff responds that the circuit court twice rejected defendant's argument when it denied defendant's motion for summary judgment and granted plaintiff's motion for class certification. Plaintiff asserts the principles of vicarious liability are inapplicable here because the FCC defined who is liable as a "sender" in its regulations. Plaintiff argues the court's rulings were correct because B2B sent defendant's fax advertisement to plaintiff "on behalf of" defendant, which is all that is required for liability under the Act.

¶ 52        The Act prohibits the sending of an unsolicited advertisement to a telephone fax machine. 47 U.S.C. § 227(b)(1)(C) (2006). Congress enacted the Act to address telemarketing abuses attributable to the use of automated telephone calls to devices including telephones, cellular telephones, and fax machines. Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 1991 U.S.C.C.A.N. (105 Stat.) 1969-70. The purposes of the Act "are to protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited,

automated telephone calls to the home and to facilitate interstate commerce by restricting the uses of [fax] machines and automatic dialers." *Id.* at 1968. Congress prohibited the transmission of "junk faxes" to fax machines so that costs of advertising could not be shifted to the recipients of fax advertisements. H.R. Rep. No. 102-317 (1991), 1991 WL 245201. Recipients of fax advertisements assume the cost of the paper used, use of the fax machine, and the time spent by the fax machine when receiving a fax advertisement during which the machine cannot be used by its owner to send or receive fax transmissions. *Id.* In 2005, the Act was amended and renamed the Junk Fax Prevention Act of 2005. See 47 U.S.C. § 227 (Supp. IV 2005).

¶ 53    The Act provides in relevant part: "It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States *** to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement ***." 47 U.S.C. § 227(b)(1)(C) (2006). An unsolicited advertisement is defined as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227(a)(5) (2006). Upon a finding by the court that the defendant willfully or knowingly violated the Act, the court may award treble damages. 47 U.S.C. § 227(b)(3) (2006).

¶ 54    In short, the plain language of the Act assigns direct liability to "any person" who sends an unsolicited fax advertisement. 47 U.S.C. § 227(b)(1)(C) (2006). Although the Act does not explicitly assign vicarious liability, our United States Supreme Court has held that, "when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules." *Meyer v. Holley*, 537 U.S. 280, 285 (2003). Here, section 217 of the Act, entitled, "Agents' acts and omissions; liability of carrier," codifies the common law *respondeat superior* doctrine:

> "In construing and enforcing the provisions of *this chapter*, the act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or user as well as that of the person." (Emphasis added.) 47 U.S.C. § 217 (2006).

See also *Hammann v. 1-800 Ideas.com, Inc.*, 455 F. Supp. 2d 942, 960 (D. Minn. 2006) (finding that "§ 217 is, in essence, a provision codifying the common law respondeat superior doctrine").

¶ 55    Sections 217 and 227 are part of the same chapter within the Act and, as such, they must be construed together. *Erlenbaugh v. United States*, 409 U.S. 239, 244 (1972) ("individual sections of a single statute should be construed together"). There is nothing in the plain language of the Act nor its legislative history suggesting Congress intended to impose liability on a party that did not send an unsolicited fax or authorize a third party to send an

unsolicited fax on its behalf.[1] See *Bridgeview Health Care Center Ltd. v. Clark*, No. 09 C 5601, 2013 WL 1154206, at \*5 (N.D. Ill. Mar. 19, 2013). The FCC implemented this prohibition by promulgating 47 C.F.R. § 64.1200(a)(3). See *In re Rules & Regulations*, 10 FCC Rcd. 12391, 12406 (1995). This regulation defines a "sender" as "the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement." 47 C.F.R. § 64.1200(f)(8) (2008). Thus, the FCC has also ruled that the Act incorporates vicarious liability. See *Bridgeview*, 2013 WL 1154206, at \*5.

¶ 56    FCC regulations also state that under the Act, "the entity or entities on whose behalf facsimiles are transmitted are ultimately liable for compliance with the rule banning unsolicited facsimile advertisements." *In re Rules & Regulations*, 10 FCC Rcd. 12391, 12407 (1995). As such, the Act "creates a form of vicarious liability making an entity liable when a third party sends unsolicited communications on its behalf in violation of the Act." *Bridgeview*, 2013 WL 1154206, at \*4 (citing *In re Rules & Regulations*, 10 FCC Rcd. 12391, 12407 (1995)). The circuit court in this case, federal courts in the Northern District of Illinois, and courts in other jurisdictions have relied upon the FCC's interpretation to conclude that a defendant cannot escape liability simply by hiring an independent contractor to transmit unsolicited facsimile advertisements on its behalf. *Bridgeview*, 2013 WL 1154206, at \*4; *Glen Ellyn Pharmacy v. Promius Pharma, LLC*, No. 09 C 2116, 2009 WL 2973046, at \*4-5 (N.D. Ill. Sept. 11, 2009); see also *Worsham v. Nationwide Insurance Co.*, 772 A.2d 868, 878 (Md. Ct. Spec. App. 2001); *Hooters of Augusta, Inc. v. Nicholson*, 537 S.E.2d 468, 472 (Ga. Ct. App. 2000).

¶ 57    Our concern in this case arises from the circuit court's application of the FCC regulations in its summary judgment ruling, which it later reaffirmed in its decision to grant plaintiff's motion for class certification. The court found, "the fax was still sent on Defendant's behalf. Nothing in the [Act] or its regulations exempts Defendant from liability because [B2B], mistakenly or otherwise, sent a fax to someone outside of Defendant's desired target group." In other words, without expressly finding an agency relationship existed between defendant and B2B, the court found defendant liable for sending the fax advertisements despite evidence demonstrating that B2B exceeded the scope of its authority.

¶ 58    The circuit court relied on the FCC's interpretation of the Act that " 'the entity or entities on whose behalf facsimiles are transmitted are ultimately liable for compliance with the [Act's] rule banning unsolicited facsimile advertisements.' " *In re Rules & Regulations*, 10 FCC Rcd. 12391, 12407 (1995). The court, however, did not consider the application of section 217 of the Act, which, by its plain language, requires courts to consider whether the

---

[1]For example, a different section of the Act regarding home telephone subscriber rights contains explicit language of vicarious liability. See 47 U.S.C. § 227(c)(5) (2006) (a person who receives more than one phone call "by or on behalf of the same entity" in one year may bring an action against that entity). In other words, Congress has the ability to assign express vicarious liability for violating the Act, but chose not to do so for section 227(b)(1)(C). The lack of explicit vicarious liability language in section 227(b)(1)(C) does not mean common law agency principles should not apply. *Meyer*, 537 U.S. at 285.

agent acted within the scope of its authority or, instead, as a rogue. If "Congress has directly spoken to the precise question at issue," in this case, the application of common law vicarious liability principals for violations of the Act, we "must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842-43 (1984).

¶ 59 The circuit court's careful and detailed analysis correctly addressed many of the issues presented by the class certification dispute, but we find that the resolution of this case requires a different interpretation of the proper legal standard for imposing vicarious liability under the Act. Section 217 of the Act requires a determination of whether B2B exceeded the scope of its authority by sending fax advertisements to companies other than those that repair and service small electric motors.

¶ 60                      Vicarious Liability as Applied to Defendant

¶ 61 The doctrine of *respondeat superior* allows an injured party to hold a principal vicariously liable for the conduct of his or her agent. *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 163 (2007); *Moy v. County of Cook*, 159 Ill. 2d 519, 523 (1994). "The test of agency is whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal." *Anderson v. Boy Scouts of America, Inc.*, 226 Ill. App. 3d 440, 443-44 (1992). "The acts of an agent beyond the scope of his authority cannot be imputed to his principal." *Stathis v. Geldermann, Inc.*, 258 Ill. App. 3d 690, 698 (1994). While the existence of an agency relationship is usually a question of fact, it becomes a question of law when the facts regarding the relationship are undisputed or no liability exists as a matter of law. *Lang v. Silva*, 306 Ill. App. 3d 960, 972-73 (1999); *Anderson*, 226 Ill. App. 3d at 444. "The burden of proving the existence of an agency relationship and the scope of authority is on the party seeking to charge the alleged principal." *Anderson*, 226 Ill. App. 3d at 444.

¶ 62 The parties in this case do not dispute the facts regarding the relationship between defendant and B2B. They do, however, dispute the legal standard for imposing vicarious liability and how the application of those legal principles affect whether plaintiff is a proper class representative.

¶ 63 The *Bridgeview* case is instructive as it presents similar factual circumstances and legal issues. There, the defendant, the owner of a business that sells and repairs hearing aids, hired B2B to send fax advertisements on its behalf. Similar to this case, the defendant dealt with salesman Wilson, who was identified as Abraham's nephew. See *Bridgeview Health Care Center Ltd. v. Clark*, No. 09-CV-05601, 2011 WL 4585028, at *1 (N.D. Ill. Sept. 30, 2011). Shortly after the defendant decided to hire B2B, he received by fax a form from Wilson entitled, " 'Tell Us What to Write in Your Free Ads.' " *Id*. The defendant completed and returned the form to Wilson. A few days later, Wilson sent the defendant a number of sample advertisements from which the defendant chose a design and made handwritten changes. *Id*. After additional revisions, the defendant requested that the advertisement include the words, " 'Toll Free,' " before his business' telephone number and approved the advertisement. *Id*. The defendant faxed a check to B2B and B2B then created a records database for the

-15-

defendant of 7,433 potential recipients. *Id*. According to Abraham, B2B sent 6,112 fax advertisements for the defendant. *Id*. B2B's computer records listed the transmission of 4,849 successful faxes, including to the plaintiff's fax number. *Id*.

¶ 64   The plaintiff filed a class action lawsuit seeking recovery on behalf of itself and a class of similarly situated persons that received an unsolicited fax advertisement in violation of section 227(b)(1)(C) of the Act. *Bridgeview*, 2013 WL 1154206, at *2. The plaintiff moved for summary judgment. In a declaration, the defendant admitted he authorized B2B to send approximately 100 fax advertisements, but denied authorizing any advertisements outside of the 20-mile radius of Terre Haute, Indiana. At issue was "whether Defendant's authorization of B2B to send *any* facsimiles on his behalf creates liability under the [Act] for *all* of the facsimiles that B2B ultimately sent." (Emphases in original.) *Id*. at *5. The plaintiff argued that once an agency relationship is established, the Act confers strict liability for all the faxes ultimately sent. The defendant asserted the Act does not abrogate traditional rules of agency and, therefore, the Act makes an entity liable only for faxes sent on the entity's behalf that were within the agent's authority.

¶ 65   The *Bridgeview* court agreed with the defendant, finding he presented sufficient evidence to partially defeat the plaintiff's summary judgment motion. *Id*. at *5-6. The court pointed to the following evidence in its decision:

> "Defendant has produced evidence to show that he did not do business outside the twenty mile radius of Terre Haute, let alone 200 miles away. [Citation.] Defendant has also declared that the business has had a toll-free number since 2001, not to garner business beyond the Terre Haute area, but for a separate purpose: to avoid long distance charges between Defendant's home in nearby Illinois and the stores in Indiana. [Citation.] Both of these undisputed facts tend to demonstrate that Defendant would have been unlikely to authorize a facsimile advertising campaign far beyond the usual scope of his business, casting doubt on Plaintiff's argument that the addition of 'toll free' and 'no shipping' language indicates an intent to distribute the advertisement more broadly. Plaintiff further points to Abraham's testimony that B2B never expanded the geographic range to which facsimiles were sent without the customer's permission. [Citation.] And Abraham also testified that while she had no recollection of any geographic [business] limits set by Defendant, local businesses typically wanted local advertising campaigns. Based on these facts, a reasonable jury could find that Defendant did not authorize B2B to send facsimiles beyond the twenty mile radius of Terre Haute." *Id*. at *6.

The court, however, limited its ruling and granted the plaintiff summary judgment "with respect to the facsimiles sent within the twenty mile radius of Terre Haute." *Id*. at *7.

¶ 66   Defendant in this case has presented more compelling evidence of his intention to limit the scope of B2B's authority than the defendant in *Bridgeview*, specifically for the first fax advertising campaign in March 2006. The record contains handwritten instructions from Wiedenbeck explicitly instructing B2B to "only market to 'Small Electric Motor Repair + Service Companys [*sic*].' " Wiedenbeck also testified that Wilson specifically told him B2B could market a list of fax telephone numbers for small electric motor repair and service companies. Abraham agreed that, in the first fax advertising campaign, defendant sought to

-16-

limit the fax recipients to "small electric motor repair and service companies nationally." Abraham admitted that the Macaw information technology specialists were supposed to input that request into the customer database, but apparently did not do so.

¶ 67    As the parties do not dispute these facts, we find as a matter of law that, for the first fax advertising campaign in March 2006, B2B exceeded the scope of its authority when it sent fax advertisements to persons or companies other than those that service and repair small electric motors. *Bridgeview*, 2013 WL 1154206, at *6-7. Whether defendant is liable for the small number of faxes sent on its behalf to persons or companies that service and repair small electric motors as part of the March 2006 fax advertising campaign remains in dispute and we do not determine that issue here.

¶ 68                    Plaintiff as an Adequate Class Representative

¶ 69    Based on our finding that B2B exceeded the scope of its authority for defendant's first advertising campaign in March 2006, liability cannot be imputed to defendant for any fax advertisements received by those outside the authorized scope. *Bridgeview*, 2013 WL 1154206, at *6-7; *Stathis*, 258 Ill. App. 3d at 698. Plaintiff is not a company that services and repairs small electric motors and, therefore, is outside the scope of fax recipients authorized by defendant for the March 2006 advertising campaign. Simply put, plaintiff is not a member of this defendant's class. *Eshaghi*, 214 Ill. App. 3d at 999. Consequently, plaintiff cannot state a valid claim against defendant for a violation of section 227(b)(1)(C) of the Act for the first advertising campaign. *De Bouse*, 235 Ill. 2d at 560. Accordingly, we find plaintiff cannot adequately represent the other potential plaintiffs for the class of recipients of the March 2006 fax. 735 ILCS 5/2-801(3) (West 2008).

¶ 70    The record shows plaintiff received one fax advertisement from defendant in March 2006. There is no evidence plaintiff received a fax advertisement from defendant in December 2006 as part of defendant's second advertising campaign. Therefore, we find plaintiff also is not an appropriate class representative for those who received unsolicited faxes from defendant in December 2006. *Id*.

¶ 71    "Class certification is not proper when the putative class representative cannot adequately represent the class sought to be certified." *De Bouse*, 235 Ill. 2d at 560. Based on the foregoing, we find the circuit court abused its discretion by granting plaintiff's motion for class certification because plaintiff cannot adequately represent the class. 735 ILCS 5/2-801(3) (West 2006); *De Bouse*, 235 Ill. 2d at 560.

¶ 72                    Adequacy of Plaintiff's Counsel to Represent the Class

¶ 73    Finally, defendant asserts the circuit court applied the wrong legal standard in determining that plaintiff's counsel was adequate for purposes of representing the class. Initially, we must address our jurisdiction over this issue of the appeal. A reviewing court has an independent duty to consider its jurisdiction and to dismiss an appeal if jurisdiction is lacking. See *Palmolive Tower Condominiums, LLC v. Simon*, 409 Ill. App. 3d 539, 542 (2010).

¶ 74    Generally, under Illinois Supreme Court Rule 306(a)(7) (Ill. S. Ct. R. 306(a)(7) (eff. Feb. 16, 2011)), a party may petition for leave to appeal to this court "from an order of the circuit court granting a motion to disqualify the attorney for any party," but not from an order denying the motion to disqualify the attorney. Illinois Supreme Court Rule 306(a)(8), which was the means through which defendant appealed to this court, allows a party to appeal from an order from the circuit court "denying or granting certification of a class action" under section 2-802 of the Code (735 ILCS 5/2-802 (West 2008)). In this case, defendant's Rule 306(a)(8) petition presented the following issues for appellate review:

> "Whether the trial court misconstrued both: (a) the applicable standard for class certification in finding the named plaintiff adequate under 735 ILCS 5/2-801(3); and (b) the clear parameters of 47 U.S.C. § 227(b)(1)(C) by holding that a defendant may be liable for unauthorized, fax advertisements sent by a third-party, contrary to express instructions, and in finding one of the recipients an adequate representative for the class.

> Whether a class originating in counsel's misconduct, the improper solicitation of the named plaintiff using information obtained through counsel's breach of an agreement of confidentiality made to a third party, meets the requirements of adequacy of counsel under 735 ILCS 5/2-801(3)."

Normally, defendant's last question, relating to adequacy of class counsel, would not be an appealable issue under Rule 306(a)(7). However, under Rule 306(a)(8), review of this issue is inherent in the determination of whether class certification was proper. Furthermore, on March 28, 2012, our supreme court entered an order directing us to address the merits of the appeal (*Uesco Industries, Inc. v. Poolman of Wisconsin, Inc.*, No. 113620 (Ill. Mar. 28, 2012) (supervisory order)) without any specific limitations as to the issues presented therein.

¶ 75    Although we have been directed to address the merits of this issue, Illinois courts generally "do not decide moot questions, render advisory opinions, or consider issues where the result will not be affected regardless of how those issues are decided." *In re Alfred H.H.*, 233 Ill. 2d 345, 351 (2009). An issue on appeal is moot if no actual controversy exists or if events have occurred that make it impossible for the reviewing court to grant the complaining party effectual relief. *Estate of Bass v. Katten*, 375 Ill. App. 3d 62, 66 (2007). As we ruled above that this particular plaintiff cannot adequately represent this class, the issue of counsel's adequacy and whether the circuit court applied the correct legal standard to determine the issue is moot. *In re Alfred H.H.*, 233 Ill. 2d at 351.

¶ 76                                    CONCLUSION

¶ 77    For the foregoing reasons, we reverse the decision of the circuit court of Cook County to grant plaintiff's motion for class certification. As a result of applying the improper legal standard, the court erred in its finding that defendant was liable for all fax advertisements sent on its behalf by B2B, which exceeded the scope of its authority to send faxes to small electric motor repair and service companies. This plaintiff has not stated a valid claim against this defendant and, therefore, is not an adequate class representative of the March 2006 fax recipients. We also find plaintiff is not an appropriate class representative for those who received unsolicited faxes from defendant in December 2006. As a result, the circuit court

abused its discretion by granting class certification. Based on this ruling, we conclude the issue of whether plaintiff's counsel is adequate to represent the class is moot.

¶ 78       Reversed and remanded.