**PALM BEACH GOLF CENTER–BOCA, INC., Plaintiff,**

v.

**John G. SARRIS, D.D.S., P.A., Defendant.**

**Case No. 12–80178–CV–WILLIAMS**

United States District Court, S.D. Florida.

Signed 03/09/2016

Entered 03/10/2016

Brian J. Wanca, Ryan Michael Kelly, David M. Oppenheim, Anderson + Wanca, Rolling Meadows, IL, Daniel J. Cohen, Phillip A. Bock, Tod Allen Lewis, Bock & Hatch, LLC, Chicago, IL, for Plaintiff.

Eric L. Samore, Erin A. Walsh, Molly A. Arranz, Thomas J. Lyman, III, Smith Amundsen, LLC, Chicago, IL, William Stuart Reese, Lane Reese Summers Ennis & Perdomo, P.A., Coral Gables, FL, Rita Chernyak, Lane Reese Summers, Ennis P.A., Coral, FL, for Defendant.

## ORDER

KATHLEEN M. WILLIAMS, UNITED STATES DISTRICT JUDGE

**THIS MATTER** is before the Court on the Parties' competing motions for partial summary judgment (DE 138, 146).

## I. BACKGROUND

Defendant Sarris hired Mike Roberts to market the Defendant's dental practice. (DE 136 ¶ 19).[1] At some point in 2005, a company called B2B solicited Roberts and offered to send "mass fax advertisements for $420.00." (DE 136 ¶ 2). B2B was run by Caroline Abraham. Abraham set up the company at the request of her husband to serve as a "middleman" for a Romanian company known as Macaw, which sold fax advertising services to companies in the United States. (DE 136 ¶¶ 10–11). The two main functions of B2B were to provide phone lines for Macaw's fax advertising services and to collect checks that could be deposited into a United States bank account that Abraham had opened for that purpose. (DE 136 ¶ 12; DE 140–5, Deposition of Caroline Abraham 13:8–14).[2] Macaw was responsible for sending fax advertising for B2B's customers. (DE 136 ¶ 14). Specifically, Macaw's Romanian-based employees were responsible for running the faxing operation, uploading the numbers for fax advertising, and actually transmitting the faxes using Abraham's phone lines. (DE 136 ¶ 14).[3] Abraham never personally used or worked on any faxing software or programs to send fax advertisements and she did not have any access to the faxing programs or software being used to send B2B faxes. (DE 161 ¶¶ 55, 58). Moreover, Abraham did not know the name or type of computer program that Macaw used to transmit the faxes and she completely lacks any personal knowledge regarding the fax broadcasting software. (DE 161 ¶ 60–61). Instead, the "computer people in Romania" controlled the faxing. (DE 161 ¶ 55; *see also* DE 140–5, Abraham Dep. 15:18–23 [Q: Is it fair to say you did not personally transmit any faxes, advertising faxes over phone lines—A: Yes."]). In

1. The Parties dispute whether Mr. Roberts was an employee or an independent contractor.

2. At times, Plaintiff has taken seemingly inconsistent positions with regard to a variety of the facts proffered in this case. For example, in Plaintiff's response to Defendant's statement of undisputed facts in support of Defendant's motion for summary judgment, Plaintiff responds:

> 12. The two main functions of B2B were to provide phone lines for Macaw's fax advertising and to collect paper checks that could be deposited into the United States bank account that Abraham had opened for that purpose. (*Id.* at 13). The two entities of B2B and Macaw are referred collectively hereinafter as 'B2B.'
> PLAINTIFF'S RESPONSE #12: Admitted for purposes of ruling on the motion for summary judgment.

(DE 153 at 5 ¶ 12). Yet, in responding to Defendant's additional statement of facts in opposition to Plaintiff's motion for summary judgment, Plaintiff responds:

> 53. B2B's two main functions were to utilize phone lines for Macaw's faxing and to collect paper checks for Macaw. (Abraham Dep. At 13:8–14).
> PLAINTIFF RESPONSE # 53: Denied. Plaintiff Response #52 is incorporated in its entirety. The record shows Abraham performed numerous functions. . . .

(DE 161 at 4–5). Despite subsequent equivocation, the Court deems these facts (and similarly developed facts) admitted based on the record. (*See* DE 140–5, Abraham Dep. 13:8–14).

3. Plaintiff admits to these facts "but deny Macaw 'was responsible' and affirmatively allege that Abraham's son, Joel Abraham, worked in Romania with Macaw at some of the relevant times." (DE 153 ¶ 14). To the extent that this response is intended to serve as a denial, it is insufficient, particularly because Plaintiff has not provided any citation to the record to support its contention.

2004, Abraham purchased a list of fax numbers and associated data from InfoU-SA[4] which she sent to Macaw in Romania, who in turn sent fax advertisements to the fax numbers contained in the InfoUSA list. (DE 136 ¶¶ 15–16).

Following B2B's solicitation of Roberts, Roberts discussed the potential fax advertising he wanted done with John Bedford.[5] (DE 136 ¶ 24). On November 30, 2005, Roberts faxed a form advertisement for Defendant's business to B2B for use in the fax advertising campaign. (DE 151 ¶ 16). On December 1, 2005, Roberts faxed revisions of the advertisement to B2B. (DE 151 ¶ 17). Roberts informed B2B that he did not want the faxes sent to businesses associated with the dental industry and directed that the faxes be sent to the following specific zip codes: 33483, 33484, 33487, 33496, 33431, 33432, 33434, 33444, 33445, and 33346.[6] (DE 136 ¶¶ 27; DE 143–1 Affidavit of Mike Roberts ¶¶ 12, 13 ["I instructed Business to Business to only send faxes to numbers in the local area; specifically, the only approved zip codes were 33484, 33484, 33487, 33496, 33431,

33432, 33434, 33444, 33445, and 33446. Moreover, I instructed Business to Business not to send any faxes to those associated with the dental practice industry"] ). On December 1, 2005, B2B sent Defendant a fax stating that B2B had "everything needed to start your faxing campaign, except payment," and on December 7, 2005, Sarris Management Corporation issued a check for $420.00 for the faxes to B2B. (DE 151 ¶¶ 22, 23). On December 12, 2005, Abraham[7] sent an email to her son Joel, stating:

> Here's the run of 10,000 that I told you about. It just got ok'd to go tonight… He wanted us to use zips 33483–4, 33487. 33431–2, 33434, 33444–6. I'm sure those will be included in the closest zips you pick up. If you have time, please check, but it's hard to imagine that they would not be included. Here's the bad part—he wants us NOT to send to dentists. I know it's a pain, but could you please remove them by deduping or whatever you do.

(DE 143–3; DE 136 ¶ 34). There is no evidence that Roberts changed his instructions[8] and Abraham has no personal

---

**4.** Abraham did not keep a copy of the list. (DE 136 ¶ 16).

**5.** John Bedford is an alias. John Bedford's actual name is Jonas Astron. (DE 140–5, Abraham Dep. 219:14–20). Jonas Astron was a friend of Conner Melville—one of Abraham's husband's nephews, whom she had met once. (*Id.* 219:18–21; 225:19–226:14). According to Abraham it "was standard practice" to use a "phone name" when communicating with clients, such that clients did not know the true identity of the person with whom they were arranging fax advertising. (*Id.* 143:7–144:6).

**6.** In response to Defendant's material fact that "Roberts avers that he forbade faxing to 'those associated with the dental industry,'" Plaintiff coyly responds "[a]dmitted that Roberts states as such in his 2012 affidavit, but is otherwise denied because a contemporaneous business record from December 12, 2005 states that Roberts did 'NOT [want] to send

[faxes] to dentists' but does not mention he dental industry generally." (DE 153 at 11–12).

**7.** Abraham never spoke to Roberts and has no personal knowledge about his directions or requests regarding the faxes at issue in this matter. In fact, Abraham has never had personal contact or communications with any customers for whom B2B was providing faxing services. (DE 140–5, Abraham Dep. 53:13–16 (Q: It was never something where the customer, the prospective customer, called you and talked to you about the service, correct? A: Correct). Rather, when customers would call about B2B's services, they were connected with a Macaw salesperson in Romania, who would discuss the faxing services with them. (*Id.* at 53:1–23).

**8.** Abraham has testified that all of the correspondence between B2B and Roberts has been produced in this case. There is no correspondence indicating that Roberts ever re-

knowledge about the specific faxes at issue in this case, other than what she gleaned from the documents produced at her deposition. (DE 136 ¶¶ 41–42; DE 140–5, Abraham Dep. 51:5–14). Abraham never spoke to anyone at Dr. Sarris's office regarding the fax advertisements, including Roberts, and she has no recollection of speaking to any salesperson at B2B or Macaw regarding the services to be provided.for Roberts.[9] (DE 136 ¶¶ 41–43; DE 140–5, Abraham Dep. 35:7–21; 51:15–23; 122:25–123:5). Abraham had no involvement in selecting the recipients to whom the fax at issue was sent; she testified that if Roberts had requested a specific target for fax advertisements, she had no way of knowing if Macaw followed the instructions when it created the list of recipients and transmitted the faxes over her phone lines. (DE 140–5, Abraham Dep. 116:20–117:2; DE 136 ¶¶ 41–45). For every single fax campaign, Macaw was responsible for uploading the numbers to which the faxes would be sent and then sending the faxes using Abraham's phone lines. (DE 151 ¶ 59; DE 136 ¶ 14; DE 160–5 32:24–33:10).[10]

Notwithstanding Roberts' instruction and the December 12, 2005 email, B2B sent the fax advertisements to persons outside the identified zip codes.[11] (DE 144–1). B2B never notified Roberts or Defendant that the faxes had been sent. (DE 136 ¶ 44). According to Plaintiff's expert, Robert Biggerstaff, 7,058 faxes advertising Defendant's services were sent by B2B. (DE 136 ¶ 47). Of those 7,058 faxes, 4,984 were sent to fax numbers associated with entries outside of the zip codes identified by Roberts and listed in Abraham's December 12, 2005 email. (DE 136 ¶ 49).[12]

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under the governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). And any such dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

■ "The moving party bears the initial burden of establishing the nonexistence of a triable fact issue." *Continental Cas. Co. v. Wendt*, 205 F.3d 1258, 1261 (11th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If the movant establishes the absence of a genuine issue of material fact, the nonmoving party must "go beyond the pleadings and by her own affidavits or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324,

---

tracted or modified the instructions he gave to B2B and identified in the December 12, 2005 email and Plaintiff has not identified any such correspondence. (DE 136 ¶¶ 35–36).

9. Roberts was the only person associated with the Defendant who communicated with B2B. (DE 136 ¶ 22).

10. Abraham does not know how the Macaw computer program generated faxing records. (DE 151 ¶ 62).

11. There has been no explanation as to how Macaw/B2B selected the 7,058 recipients and Abraham has no personal knowledge regarding that process.

12. Plaintiff doesn't dispute that 4,894 faxes were sent to zip codes other than those identified by Roberts and listed by Abraham in the December 2005 email, but contests what effect, if any, Roberts' instruction has on Defendant's liability.

106 S.Ct. 2548 (quoting FED. R. CIV. P. 56(c)). Thus, "[i]f the non-movant ... fails to adduce evidence which would be sufficient ... to support a jury finding for the non-movant, summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted). When a motion for summary judgment is presented to the Court, it opens the entire record for consideration, and the Court may enter judgment in favor of the non-moving party on any grounds apparent in the record, even where there is no formal cross-motion. *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1204 (11th Cir. 1999).

In evaluating a motion for summary judgment, the Court considers the evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials ...." Fed. R. Civ. P. 56(c)(1)(A). The Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the non-movant." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008) (quotation marks and citations omitted). While all reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant, "an inference based on speculation and conjecture is not reasonable." *Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013). Thus, "the nonmoving party cannot create a genuine issue of material fact through speculation, conjecture, or evidence that is 'merely colorable' or 'not significantly probative.'" *Phillips v. Smith*, 429 Fed.Appx. 905, 907 (11th Cir. 2011). At the summary judgment stage, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

## III. ANALYSIS

Plaintiff has moved for partial summary judgment on whether the fax at issue was an advertisement within the meaning of the TCPA, whether the advertisement was successfully sent by fax to 7,085 telephone numbers, and whether the fax was sent without the recipient's prior express invitation or permission to do so. (DE 139 at 3–4). Defendant has not responded to Plaintiff's argument regarding whether the faxes at issue constitute an advertisement within the meaning of the TCPA, and the Court concludes that they do. Defendant has also moved for partial summary judgment. Defendant contends that it is entitled to judgment in its favor for those faxes that were sent outside of the zip codes authorized by Roberts.

The TCPA makes it unlawful "to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement" unless certain requirements are met. *See* 47 U.S.C. § 227(b)(1)(C). An unsolicited advertisement is "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C.A. § 227(a)(5). It is only when not all of the requirements of the TCPA are met that the TCPA allows private parties to sue the "sender" of the advertisements for statutory damages. *Physicians Healthsource*, 2015 WL 1257983, at *1 (S.D. Fla. Mar. 18, 2015). It is undisputed that the faxes at issue here are advertisements and that they did not comply with the requirements of the TCPA. Consequently, Plaintiff's motion for summary judgment is **GRANTED IN PART** insofar as it relates to Plaintiff's request that partial summary judgment be entered in its favor that the

faxes at issue are advertisements that did not comply with the TCPA.[13]

The Parties disagree as to whether B2B successfully sent 7,085 faxes. At the crux of this dispute is the competing testimony of Robert Biggerstaff (whom Plaintiff has offered as an expert witness) and David Canfield (whom Defendant has offered as an expert witness). Both Parties have moved under Rule 702 of the Federal Rules of Civil Procedure and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) to exclude the testimony of the other's expert witness. (*See* DE 167, 168). Because the Court finds that the issue of whether the Parties' expert witnesses have conclusively demonstrated that the faxes at issue were, or were not, successfully sent is subject to some dispute and· is likely to turn on the Court's rulings on the Parties' *Daubet* motions, the Court **RESERVES** on this issue. Nonetheless, for the purposes of ruling· on the present motions, the Court assumes, without deciding, that 7,085 faxes were successfully sent. Assuming that 7,085 faxes were successful-

ly sent, the Parties dispute whether Defendant can be held liable for all 7,085 faxes or only for those faxes sent to the zip codes identified by Roberts.

■ The TCPA provides for "direct liability" for the sender of a non-compliant fax advertisement. *Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1256 (11th Cir. 2015). Under the TCPA, a "sender" is the "the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement." 47 C.F.R. § 64.1200(f)(1). Thus, a "person whose services are advertised in an unsolicited fax transmission, *and on whose behalf* the fax is transmitted, may be held liable directly under the TCPA's ban on the. sending of junk faxes." *Sarris*, 781 F.3d at 1284 (emphasis added).[14] Neither party has moved for summary judgment regarding whether or not the faxes were sent on behalf of the Defendant, but for the purposes of resolving the motions for summary judgment, the Court assumes

**13.** Because it is undisputed that the faxes did not comply with all of the TCPA's requirements, including the requirement that the fax contain a telephone and fax number that the recipient can use to opt-out, the Court need not reach the issue of whether or not any person consented to receive the faxes. *See Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 684 (7th Cir. 2013) ("Because Top of Mind omitted opt-out notices, it does not matter which recipients consented. or had an established business relation with Turza"); *Paldo Sign & Display Co. v. Wagener Equities, Inc.*, 67 F.Supp.3d 874, 884–85 (N.D. III. 2014); *Physicians Healthsource*, No. 12–22330–CIV, 2014 WL 7366255, at \*5 (S.D. Fla. Dec. 24, 2014) ("Courts routinely certify TCPA class actions precisely because the requirement of an opt-out notice obviates the need to consider consent or established business relationships.").

**14.** In *Sarris*, the FCC explained that the sender is the person "on whose behalf the

advertisement is sent." In so doing, the FCC explicitly relied on an earlier ruling which explained that "[i]*n most cases*, this will be the entity whose product or service is advertised or promoted in the message." In the Matter of Rules & Regulations, 21 FCC Red 3787, 3808 (2006) (emphasis added). "This binding order implies that a necessary condition to being a 'sender' is that a fax ad is sent on one's behalf, but that, *in some instances*, an entity whose product or service is advertised will not be deemed a 'sender' and would therefore not be liable." *Bridgeview Health Care Ctr. v. Clark*, No. 09 C 5601, 2015 WL 1598115, at \*6 (N.D. III. Apr. 8, 2015) (emphasis in original); *see also Loncarevic v. Stanley Foam Corp.*, No 09 CH 15402 (Cook Cty. Cir. Ct. Oct. 18, 2013) (explaining that in order to qualify as a sender, "[i]t is not enough that the fax merely identify the defendant. Rather, it must also be shown that the fax has genuinely been sent on the defendant's behalf—that ·is, at the defendant's behest.").

that Roberts was acting on Defendant's behalf when he arranged to have faxes sent by B2B and that he approved a final draft of the advertisement.[15]

The undisputed evidence in this case shows that Roberts instructed B2B to only send faxes to certain specific zip codes, namely 33483, 33484, 33487, 33496, 33431, 33432, 33434, 33444, 33445, and 33346 and directed B2B not to send any faxes to people in the dental industry. (DE 143–1, Roberts Aff. ¶¶ 12, 13 ["I instructed Business to Business to only send faxes to numbers in the local area; specifically, the only approved zip codes were 33484, 33484, 33487, 33496, 33431, 33432, 33434, 33444, 33445, and 33446. Moreover, I instructed Business to Business not to send any faxes to those associated with the dental practice industry"]). Roberts' undisputed testimony that he placed specific limitations on where the faxes were to be sent is corroborated by, as Plaintiff describes it, a "contemporaneous business record from December 12, 2005" which states that

> He (Roberts) wanted us to use zips 33483–4, 33487. 33431–2, 33434, 33444–6.

I'm sure those will be included in the closest zips you pick up. If you have time, please check, but it's hard to imagine that they would not be included. Here's the bad part—he wants us NOT to send to dentists. I know it's a pain, but could you please remove them by deduping or whatever you do.

(DE 143–3; DE 136 ¶ 34). There is no evidence to rebut Roberts' sworn testimony regarding his instructions to B2B, which is bolstered by a contemporaneous business record from B2B identifying the particular limitations Roberts placed on the faxing campaign.

In the face of this unrebutted testimony, Plaintiff offers only speculation, conjecture, and inadmissible testimony and attempts to create an issue of material fact by impugning the character of Roberts and defense counsel. For example, Plaintiff contends that Abraham "testified that in this case there were no 'restrictions as to zip codes,' ' and that "she was always careful to follow customer instructions." (DE 152 at 4).[16] However, Abraham lacks any personal knowledge whatsoever about

**15.** As the Eleventh Circuit noted in this case: "[T]here is sufficient record evidence to support having a jury decide whether the fax was sent on behalf of Defendant. First, there is record evidence that Sarris, D.D.S. hired a marketing manager to market its dental practice and gave him 'free rein' to do so. Next, the record demonstrates that Defendant's marketing manager contracted with B2B to initiate a fax advertisement campaign on behalf of the dental practice. Further, the record shows that, on December 13, 2005, after receiving payment of $420.00 from Defendant, B2B transmitted an unsolicited fax advertisement promoting Sarris, D.D.S.'s services to Palm Beach Golf, which occupied Plaintiff's fax machine for one minute. While there is contrary equivocal evidence that the final draft of the advertisement used may not have been approved by Defendant, under the summary judgment standard, the question of on whose behalf the fax advertisement was sent is a question to be decided by a jury." *Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris,*

*D.D.S., P.A.,* 781 F.3d 1245, 1258 (11th Cir. 2015). In addition, the unrebutted evidence shows that Dr. Sarris had no personal knowledge regarding any fax advertising, that he never spoke to anyone at B2B, that he did not know how anyone in his office came in contact with B2B, and that Roberts never told Dr. Sarris about his conversations with B2B. (DE 136 ¶ 21). Consequently, whether Defendant can ultimately be held liable for any of the faxes is a question of fact for the jury.

**16.** The Court notes that other courts have found that B2B and Abraham did not "always" follow customer instructions. See, e.g., *Creative Montessori Learning Ctr. v. Ashford Gear, LLC,* No. 09 C 3963, 2014 WL 865963, at *2 (N.D. III. Mar. 3, 2014) ("It is undisputed that none of the three payment methods was followed in the instant case. Instead, without providing defendant an invoice, estimate or payment letter, B2B on June 7, 2006, faxed the ad to a list of fax numbers that B2B had purchased from a third party. The follow-

Roberts' instructions. The testimony cited by Plaintiff reveals that Abraham's statement regarding zip codes was based on her review of documents produced in this case, not on her own personal recollections, and is entirely speculative. (*See* DE 140–5, Abraham Dep. 175:10–15 [Q: Is there any indication in the documents that there were any restrictions placed on where the fax ads were to go specifically? Were there any restrictions related to zip codes or area codes? A: No."). Indeed, Abraham testified that she never spoke to any customers regarding their orders and Plaintiff concedes that Abraham lacks personal knowledge regarding Roberts' instructions.[17] Thus, Abraham's testimony fails to create a genuine issue of material fact. *See, e.g., Corwin v. Walt Disney Co.*, 475 F.3d 1239 (11th Cir. 2007) (holding that even on summary judgment, a court is not obligated to take as true testimony that is not based upon personal knowledge).

Plaintiff next casts aspersions on Roberts' sworn testimony and defense counsel's character, suggesting that Roberts may have seen the 2005 email before signing his affidavit and positing that "it can reasonably be assumed that Roberts was shown the email, and was possibly even

ing day, without notice to defendant, Abraham created a check in the amount of $542 payable to B2B using defendant's bank information found on the $28 check made payable to Maxileads. It is undisputed that defendant has never issued a check to B2B, and never specifically approved a broadcast to a list of potential recipients supplied by B2B.... On June 14, 2006, B2B sent a second fax campaign to over 19,000 fax numbers. That same day Abraham prepared a second check payable to B2B in the amount of $792 using the bank information from defendant's check to Maxileads. Defendant instructed its bank to refuse payment on that check. The bank returned the check to B2B and assessed a service charge. Defendant has never paid for the second set of faxes ... Defendant never sent B2B a check for payment, or ever authorized Abraham to create her own checks, and Abraham testified that receipt of payment is the final step in the approval process."); *Bridgeview Health Care Ctr. Ltd. v. Clark*, No. 09 C 5601, 2014 WL 7717584, at *2 (N.D. Ill. Nov. 21, 2014) (finding that defendant had only authorized B2B to send 100 ads to local businesses within twenty miles of defendant's business but that B2B sent 6,000 ads to businesses located much farther than twenty miles from defendant's business and concluding that defendant was only liable for the 32 faxes sent within a twenty mile radius of his business); *Uesco Indus., Inc. v. Poolman of Wisconsin, Inc.*, 2013 IL App (1st) 112566, ¶ 10, 373 Ill.Dec. 97, 993 N.E.2d 97 (finding that defendant directed B2B to only send faxes to certain types of businesses and that "Abraham acknowledged that, in the first fax advertising campaign, defendant sought to limit the fax recipients to 'small electric motor repair and service companies nationally' " but that B2B did not follow its customer's instructions).

17. *See* DE 140–5, Abraham Dep. 51:10–23 (Q: As you sit here today, do you have any recollection or knowledge about John G. Sarris, D.D.S. separate and apart from the documents that you brought with you? A: No. Q: Do you remember having talked to anyone at Dr. Sarris's office regarding any services you provided? A: No. Q: Do you recall speaking to anybody, a salesperson that would have been associated with B2B or Macaw regarding any services to be provided for this particular customer? A: I don't remember); 53:13–16(Q: It was never something where the customer, the prospective customer, called you and talked to you about the service, correct? A: Correct); 35:18–21 (Q: Do you believe that you ever spoke to a person by the name of Mike Roberts? A: I don't remember anything—any conversation like that); Abraham Dep. 122:25–123:5 (Q: There was no offer made to Mr. Roberts to provide him with the list of potential targets, true? A: True—I don't know. I don't know what the salesperson discussed with him. I don't see anything in writing about it.); 116:20–117:2 (Q: If Mr. Roberts had requested a specific target for any fax advertising to be done, you wouldn't know one way or the other whether individuals at Macaw had in fact followed those instructions, true? A: True. wouldn't—I don't know how I would be able to figure that out.).

'coached' to give a false 'limiting instruction' answer." (DE 152 at 7). First, the Court does not rule on assumptions; it rules on facts. *See Lopez v. AT & T, Corp.*, 457 Fed.Appx. 872, 874 (11th Cir. 2012) ("Speculation or conjecture cannot create a genuine issue of material fact."). Second, Plaintiff offers as "material facts" the propositions that "Roberts has never denied that he ordered 10,000 faxes" (DE 151 ¶ 32), and that Roberts has "never explained why he now claims the 'only approved zip codes were 33484, 33484, 33487, 33496, 33431, 33432, 33434, 33444, 33445, and 33446' " (DE 151 ¶ 31). Plaintiff's attempt to inject some sort of adverse inference against the only sworn testimony regarding the faxing instructions is improper and not supported by the record. Finally, to the extent Plaintiff seriously complains about Roberts' failure to explain his business rationale, such a purported failure is of Plaintiff's own making as he elected not to depose Roberts. The unrebutted and contemporaneously corroborated evidence is that Roberts placed specific limitations on the zip codes to which he wanted faxes sent.

Plaintiff also laments that, "[f]or an ordinary consumer, the burden in asserting a TCPA claim would be multiplied if a defendant advertiser could insulate itself from liability by asserting defenses based on secret limitations placed on a broadcaster." (DE at 12).[18] Roberts placed an explicit limitation on B2B in sending the faxes, which B2B disregarded. It is unlikely that the burden on an ordinary consumer in bringing a TCPA action would be enhanced by limiting liability to those faxes authorized by the Defendant. To prevail under the TCPA, the Plaintiff must show that the fax was successfully sent, which, in most cases, will entail a review of the broadcaster's services and operations.[19] In a case like this, where the broadcaster

---

**18.** The reference to "secret limitations" is based entirely on Plaintiff's analysis of traditional vicarious liability agency principles. The issue before the Court, however, is whether defendant can be held directly liable. (DE 152 at 14–15). *See Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1255 (11th Cir. 2015); *Imhoff Inv., L.L.C. v. Alfoccino, Inc.*, 792 F.3d 627, 629 (6th Cir. 2015) (noting that "the pertinent FCC regulations indicate that primary, not vicarious liability attaches to [defendant] under the TCPA."). Moreover, the maxim that a principal will be bound based on the actions or statements of its agent, notwithstanding the principal's "secret" instructions to the contrary, is based on the idea that third-parties dealing with, and relying on the representations of the agent, have no way of knowing the limitations and should not be punished for reasonably relying on the agent. There are no concerns regarding detrimental reliance, or in fact, any reliance, present in this case. Plaintiff's own briefing recognizes as much: "Nevertheless, the manifestation is sufficient because the cardholder principal placed the agent in such a position as to *mislead* third persons into believing that the agent was clothed with such authority." (DE 152 at 15) (emphasis in original). Plaintiff never saw the fax at issue, has no knowledge about the fax, and could not have relied on the fax. Accordingly, the Court finds Plaintiff's argument regarding agency and "secret limitations" and the cases relied on by Plaintiff to be unconvincing, inapposite, and inapplicable to the TCPA's prohibition on faxing.

**19.** The only burden presented is on the plaintiff's counsel as the Parties agree that Plaintiff is all but irrelevant to this action inasmuch as Plaintiff has no memory or personal knowledge that he received the fax at issue. At oral argument, Plaintiff's counsel stated, "we are not proving our case through Mr. Sugarman; we're proving our case through Mr. Bigerstaff and the electronic data." (DE 95, Hrg. Tr. at 21.) Defense counsel concurred, saying Sugarman "admittedly has no evidence, zero, besides what the plaintiff's attorneys have provided." (Hrg. Tr. at 37.); (*see also* DE 38 at 2–3 ["Plaintiff's testimony is not essential to proving either Plaintiff's case or that of other class members, which will instead be established through expert testimony based on the Abraham computer data."].)

failed to comply with the clear, explicit directions of the Defendant, the TCPA permits the broadcaster to be held liable for the faxes.[20] *See* 47 C.F.R. § 64.1200 (A)(4)(vii) (explaining that a "facsimile broadcaster" can be liable for violations of the TCPA if the broadcaster "demonstrates a high degree of involvement in, or actual notice of, the unlawful activity and fails to take steps to prevent such facsimile transmissions."); *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991 Junk Fax Prevention Act of 2005*, 21 F.C.C. Rcd. 3787, 3808 (2006) ("If the fax broadcaster supplies the fax numbers used to transmit the advertisement, for example, the fax broadcaster will be liable for any unsolicited advertisements faxed to consumers and businesses without their prior express invitation or permission. We find that a fax broadcaster that provides a source of fax numbers, makes representations about the legality of faxing to those numbers or advises a

client about how to comply with the fax advertising rules, also demonstrates a high degree of involvement in the transmission of those facsimile advertisements. In addition, we conclude that a highly involved fax broadcaster will be liable for an unsolicited fax that does not contain the required notice and contact information. In such circumstances, the sender and fax broadcaster may be held jointly and severally liable for violations of the opt-out notice requirements.").[21] Notwithstanding the fact that Abraham and B2B are not Parties to this suit, Plaintiff's ostensible concern for public policy does not create a genuine issue of material fact.

Plaintiff points to Defendant's answer to an interrogatory as evidence that there were no restrictions placed on B2B in conducting the fax campaign. (DE 152 at 6). Specifically, Defendant gave the following responses to a set of May, 2010 interrogatories:[22]

**20.** "The term facsimile broadcaster means a person or entity that transmits messages to telephone facsimile machines on behalf of another person or entity for a fee." 47 C.F.R. § 64.1200.

**21.** Indeed, the FCC referenced this provision in responding to Eleventh Circuit's request in this case. *See John Ley*, 13–14013, 2014 WL 3734105, at *6 (OHMSV July 17, 2014) ("Under the FCC's rules, a party that transmits the unsolicited facsimile advertisement, but does not also meet the definition of 'sender,' may nevertheless be jointly and severally liable (along with the sender) 'if it demonstrates a high degree of involvement in, or actual notice of, the unlawful activity and fails to take steps to prevent such facsimile transmissions.' 47 C.F.R. § 64.1200(a)(4)(vii); *see Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 21 FCC Red 3787, 3808 (¶ 40) (2006) (*Junk Fax Order*). Such 'high degree of involvement' by the party transmitting the facsimile may include 'supplying the fax numbers used to transmit the advertisement,' 'making representations about the legality of faxing to those numbers,' or 'advising a client about how to comply with the fax advertising rules.' *Junk Fax Or-*

*der*, 21 FCC Red at 3808 (¶ 40); *see also Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Red 14014, 14131 (¶ 196) & n.724 (2003) (noting that requisite high degree of involvement by the party transmitting the fax may also include a 'role' in reviewing and assessing the content of a facsimile message)."); *see also City Select Auto Sales, Inc. v. David/Radall Associates, Inc.*, No. CIV.A. 11–2658 JBS, 2015 WL 4507995, at *4 (D.N.J. July 23, 2015) (entering default judgment against Abraham for $22,405.00 in damages based on joint and several liability for TCPA violations).

**22.** At the time the interrogatories were served and answered, Dr. Sarris was still a defendant. The Court notes that Plaintiff has not provided the Court with the instructions or definitions which accompanied the interrogatories and as such, the Court does not know how the term "Defendant" was defined. In any event, for the reasons set forth below, the Court finds the answer to the interrogatory does not create a genuine issue of material fact.

20: If Defendant instructed any person to construct, develop, or otherwise use a list of persons and/or telephone numbers to send any facsimile transmission identified in Interrogatory No. 2, describe in detail all directions and/or instructions given to such third party for determining the contents of such a list, including but not limited to 1) the areas codes or states to be selected, 2) the SIC codes to be selected, 3) any other selections or filtering criteria.

A: Defendant did not give any such instruction to any person. In addition, see answer to Interrogatory Number 10.

In turn, Interrogatory No. 10 states:

10. Fully identify each and every person who participated in Defendant's decision to send facsimile transmissions identified in Interrogatory 2, and state the extent and substance of each person's participation therein.

A: Dr. Sarris employed a marketing person, Mike Roberts, to expand his business. Mr. Roberts contacted Dr. Sarris regarding the sending of facsimiles. The subject fax, attached to the Complaint, was placed in newspapers and magazines. Dr. Sarris has no personal knowledge of how exactly and when exactly any fax was sent through a sending device. Dr. Sarris has no knowledge concerning any telephone number or telephone line connected with any sending device. Dr. Sarris has no personal knowledge whether a fax was actually sent or who received the fax other than various lawsuits that were filed concerning the same fax, which settled without adjudication of any facts. A fax company called Business to Business Solutions contacted Mike Roberts and was paid by Sarris Management Corporation on December 7, 2005, related to the subject fax.

In connection with Interrogatory No. 10, Interrogatory No. 2 provides:

2. State whether Defendant, or any other entity acting on Defendant's behalf, has utilized facsimile transmissions delivered by telephone during the Relevant Time Period which either (1) were used for advertising or promotional purpose, or (2) which advertised any property, goods or services, and describe in detail the content of each different document sent by such transmissions and the time period each different document was sent.

A: Objection, vague and ambiguous. Notwithstanding, not to the best knowledge of these Defendants.

Likewise, Interrogatory No. 19 states:

19. Describe in detail how Defendant obtained or developed a list of persons and/or telephone numbers to which telephone calls have been initiated by or on behalf of Defendant that utilized a facsimile transmission identified in Interrogatory No 2...

A: Defendants have no personal knowledge concerning this interrogatory. See answer to Interrogatory No. 2.

In sum, the interrogatory responses make clear that Defendants themselves, i.e., Dr. Sarris and Sarris Dental, had no personal knowledge regarding the faxing campaign or any limitations or instructions given to B2B. Accordingly, Defendant directed Plaintiff to Roberts as the person with knowledge regarding the campaign and any limitations placed on it. As the Parties both admit, only Roberts communicated with B2B regarding the faxing. Consequently, the Court finds that Defendant's answers to the May 2010 interrogatories are not directly contrary to Roberts' affidavit or the contemporaneous December 2005 email. Rather, the answers are wholly consistent with Defendant's position throughout this case—that it had no involvement in the faxing campaign and that all decisions regarding the campaign

were made by Defendant's independent contractor, Mike Roberts.

Finally, Plaintiff argues that Defendant "ratified the faxes." (DE 152 at 3). Specifically, Plaintiff asserts that Defendant received a letter from an attorney concerning a fax sent to Presbytery of Tropical Florida. According to Plaintiff, B2B records show that Presbytery of Tropical Florida was located in zip code 33064 and "[d]espite the fact that Presbytery was located outside of Roberts' alleged zip code limits (33064), Roberts did not complain of any alleged instructions when he contacted B2B's Wilson on January 25, 2006." (DE 152 n.3). Consequently, Plaintiff concludes that Defendant "did not object or repudiate the faxing" and thereby ratified it. (DE 152).

The Court is concerned about Plaintiff's characterization of the facts. The undisputed evidence shows that the January 20, 2006 letter from the Law Offices of Peter Price on behalf of Presbytery of Tropical Florida does not identify Presbytery's zip code. (*See* DE 140–2 at 50–53). As such, Plaintiff's contention that Roberts (and therefore Defendant) somehow knew that his explicit order regarding zip codes had been disregarded has no foundation in fact, but, once again, is based entirely on Plaintiff' own speculation and conjecture. Moreover, the undisputed evidence shows that upon receipt of the letter, Roberts forwarded the letter to B2B, along with correspondence from Defendant's attorney, asking B2B to contact Defendant's lawyer "ASAP." (DE 140–2 at 50–53; DE 140–2, Deposition of Dr. Sarris 22:4–18). Accordingly, the Court finds that the undisputed evidence is that Roberts provided B2B with specific limiting instructions, which B2B disregarded, and that there is no evidence that Roberts ever altered, amended, revoked, or changed those limitations nor did he ratify B2B's decision to send faxes to zip codes other than those he designated. *See Siding & Insulation Co. v. Alco Vending, Inc.*, No. 1:11 CV 01060, 2015 WL 1858935, at *12 (N.D. Ohio Apr. 22, 2015) (the undisputed fact that defendant immediately contacted B2B upon receiving complaints from fax recipients and demanded that B2B handle the claims and defend and indemnify the defendant did not demonstrate ratification, but, rather, repudiation).

The unrebutted evidence is that Roberts placed specific limitations on to whom the faxes were to be sent. Accordingly, the question becomes whether Defendant can be liable for Abraham's failure to abide by those limitations. Under the TCPA, a defendant is only liable for faxing if the faxes were sent on behalf of the defendant. Plaintiff argues that even if it is clear that B2B exceeded its authority and sent faxes in contravention to Roberts' directions, Defendant is nonetheless liable for B2B's actions. By way of illustration, under Plaintiff's theory, if a doctor asked an employee to send 10 faxes to specific existing clients regarding new services offered by the doctor and the employee, on his own volition, instead sent 15,000 faxes, the Plaintiff would hold the doctor liable for all 15,000 faxes because, in Plaintiff's view, those 14,990 faxes were also sent "on behalf of the doctor".

The Court agrees with those courts who have considered this issue after the Eleventh Circuit's decision in this matter and finds that "Plaintiffs' interpretation leads to absurd results which cannot possibly follow from a permissible construction of the TCPA or from an agency's reasonable interpretation of its regulations." *Cin–Q Auto., Inc. v. Buccaneers Ltd. P'ship*, No. 8:13–CV–01592–AEP, 2014 WL 7224943, at *6–9 (M.D. Fla. Dec. 17, 2014). As the court in *Bridgeview Health Care Ctr. v. Clark*, No. 09 C 5601, 2015 WL 1598115, (N.D. Ill. Apr. 8, 2015) noted: "[M]ore

fundamentally, a rule of strict liability would lead to absurd results. To conclude that a defendant is always liable for faxes advertising her goods or services would allow an overzealous third party to expose a defendant to substantial liability without notice or without receiving any direction to do so."

The Court must determine whether the 4,984 faxes sent to zip codes other than those specifically directed by Roberts were sent "on behalf of Defendant. Although the TCPA does not define the term "on whose behalf as used in the context of fax transmissions, other courts, including the Eleventh Circuit, have offered guidance on how to determine whether a fax was sent on a particular defendant's behalf. For example, one court explained that "put another way," on behalf of means when "an entity asks another person or entity to physically accomplish the transmission of an unsolicited fax that it would otherwise have sent itself." *Hughes v. FrontRange Sols. USA, Inc.*, No. D049869, 2007 WL 2998981, at *3 (Cal. Ct. App. Oct. 16, 2007). Likewise, in *Paldo Sign and Display v. Wagener equities, Inc.*, Case No. 09–C–7299 at DE 321, the Court ruled that "the appropriate standard to define whether a defendant is the 'sender' of faxes advertising its products or services is whether the defendant 'authorized' the fax transmission."

The Court finds the opinion in *Bridgeview Health Care Ctr. v. Clark*, No. 09 C 5601, 2015 WL 1598115, (N.D. Ill. Apr. 8, 2015) particularly instructive. The appropriate standard for determining whether a fax was sent on a defendant's behalf "requires a totality-of-circumstances review, which incorporates the *Sarris* factors [23] and other considerations including, but not limited to: the defendant's degree of input

and control over the content of the faxes, the actual content of the faxes, contractual or expressly stated limitations in the scope of control between the parties, the defendant's approval of the final draft of the faxes and their recipients, and the defendant's overall awareness of the circumstances." *Bridgeview Health Care Ctr. v. Clark*, No. 09 C 5601, 2015 WL 1598115, at * 7 (N.D. Ill. Apr. 8, 2015); *see also Cin-Q Auto., Inc. v. Buccaneers Ltd. P'ship*, No. 8:13–CV–01592–AEP, 2014 WL 7224943, at *7 (M.D. Fla. Dec. 17, 2014) ("This Court is, therefore, left only to conclude that 'on whose behalf' is a standard lying somewhere in the middle—more forgiving than a blanket application of *per se* liability but somewhat more stringent than vicarious liability through common law agency ... Circumstances to be considered include, but are not limited to, the degree of input and control over the content of the fax(es), the actual content of the fax(es), contractual or expressly stated limitations and scope of control between the parties, privity of the parties involved, approval of the final draft of the fax(es) and its transmission(s), method and structure of payment, overall awareness of the circumstances (including access to and control over facsimile lists and transmission information), and the existence of measures taken to ensure compliance and/or to cure non-compliance with the TCPA.").

Considering a totality of the undisputed facts in this case, the Court finds that the faxes sent to zip codes other than those identified by Roberts were not sent on Defendant's behalf and therefore Defendant cannot be held liable for them. The undisputed facts are that Roberts specifically directed B2B to advertise Defen-

---

**23.** The Court in *Bridgeview Health Care Ctr. v. Clark*, No. 09 C 5601, 2015 WL 1598115, (N.D. Ill. Apr. 8, 2015), identified "(1) the extent and nature of control the defendant had over the third-party engaged in marketing on his behalf; and (2) whether the defendant approved the final draft of the fax marketing plan" as the Sarris factors.

dant's business in certain zip codes and to persons not associated with the dental industry. Roberts never altered or amended his instructions and he had no reason to believe that B2B would disregard them. Moreover, B2B, not Roberts, supplied and uploaded the fax numbers used to transmit the advertising and was the only entity with access to and control over the fax lists and transmission information. (*See* DE 151 ¶ 59; DE 136 ¶ 14; DE 160–5 32:24–33:10). And, the undisputed evidence shows that B2B did not comply with Roberts' explicit instructions.[24] Consequently, the Court finds that those faxes sent to zip codes other than those requested by Roberts could not have been sent on his behalf, much less on the Defendant's behalf. *See Bridgeview Health Care Ctr. Ltd. v. Clark*, No. 09 C 5601, 2014 WL 7717584, at *2 (N.D. III. Nov. 21, 2014) (finding that defendant was not liable for faxes sent by B2B outside of the twenty mile radius authorized by defendant); *Uesco Indus., Inc. v. Poolman of Wisconsin, Inc.*, 2013 IL App (1st) 112566, ¶¶ 66–67, 373 Ill.Dec. 97, 993 N.E.2d 97, 113–14 (finding defendant was not liable when B2B disregarded defendant's specific instructions to limit the faxes to certain businesses and B2B created the fax recipient list, and concluding that "[b]ased on our finding that B2B

exceeded the scope of its authority for defendant's first advertising campaign in March 2006, liability cannot be imputed to defendant for any fax advertisements received by those outside the authorized scope."). Accordingly, the Defendant's motion for partial summary judgment is **GRANTED**, and the Defendant is not liable for the 4,984 faxes sent to zip codes other than 33483, 33484, 33487, 33496, 33431, 33432, 33434, 33444, 33445, and 33346. This matter will proceed to trial to determine whether Defendant is liable for those faxes sent to 33483, 33484, 33487, 33496, 33431, 33432, 33434, 33444, 33445, and 33346.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment (DE 138) is **GRANTED IN PART AND DENIED IN PART.** Defendant's motion for summary judgment (DE 146) is **GRANTED.**

**DONE and ORDERED** in Chambers in Miami, Florida this 9th day of March, 2016.

---

**24.** The cases cited by Plaintiff are inapposite. For example, in *CE Design Ltd. v. C & T Pizza, Inc.*, 2015 IL App (1st) 131465, 392 Ill.Dec. 150, 32 N.E.3d 150 there was no undisputed, unequivocal instruction regarding a specific limitation on the fax range. Rather, the defendant had a discussion with B2B were he stated that the faxes were "supposed to be like a couple of miles from the business." As the court in that case noted, "[t]his is hardly a strict instruction to B2B to limit all faxes to exactly two miles." *Id.* Likewise, in *Loncarevic v. Stanley Foam Corp.*, No 09 CH 15402 (Cook Cty. Cir. Ct. Oct. 18, 2013), the defendant had hired an independent contractor to "do what [he] thought was best" regarding the faxing campaign. That independent contractor, in turn, asked B2B to send faxes

across the country. The defendant then asserted that he had only given the independent contractor permission to do marketing in the tri-state area. The Court found that because the defendant had given the independent contractor the authority to manage the marketing as he saw fit, and because the independent contractor had not placed any limitations on B2B, the defendant was liable for all of the faxes. *Id.* Finally, in *Mixon Insurance Agency v. Taylonville Chiropractic Clinic, Ltd.*, No. 09 L 0509 (St. Clair Cty. Cir. Ct. Jan. 30, 2105), the defendant gave inconsistent testimony regarding the geographic limitations he placed on B2B for its faxing. Mr. Roberts' sworn testimony has been entirely consistent and is corroborated by the December 2005 email.